16 F.3d 1408
 38 ERC 1289, 62 USLW 2462, 24 Envtl.
L. Rep. 20,791
 Brian FEIKEMA; Pamela Feikema; Harley Ferrell; Shirley
Ferrell; Joseph Fleming; Maryann Fleming; John H.
Hammond; Karen Hammond; Robert Kertscher; Nancy
Kertscher; Peter Kot; Ann Kot; William I. Lowry; Rose
Lowry; Mary Louise Salem, Plaintiffs-Appellants,
v.
TEXACO, INC.; Texaco Refining and Marketing (East),
Incorporated; Saudi Refining, Inc.; Star
Enterprise, Defendants-Appellees.
 No. 93-1649.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 28, 1993.
Decided March 3, 1994.
 
 ARGUED: Mark P. Friedlander, Jr., Friedlander & Friedlander, P.C., Arlington, Virginia, for Appellants. Richard E. Wallace, Jr., Howrey & Simon, Washington, D.C., for Appellees. ON BRIEF: Mitchell E. Rapp, John L. Howard, Jr., Howrey & Simon, Washington, D.C.; John A.C. Keith, Blankingship & Keith, Fairfax, Virginia, for Appellees.
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 The question of first impression presented on this appeal is whether the Resource Conservation and Recovery Act, 42 U.S.C. Sec. 6901 et seq., or an administrative order entered pursuant to it, preempts state common law causes of action for nuisance and trespass. Several homeowners in Fairfax, Virginia, filed a complaint in March 1993 against Texaco, Inc. and Star Enterprises (collectively "Texaco"), alleging that a plume of oil which leaked from a nearby petroleum distribution terminal owned by Texaco damaged and continues to damage their properties. The complaint requested injunctive relief and demanded damages in an unspecified amount. The district court dismissed the complaint on preemption grounds, and the homeowners appealed. Concluding that the claims for injunctive relief are preempted but that claims for state law damages are not, we vacate the judgment and remand the case for further proceedings consistent with this opinion.
 
 
 2
 * Texaco owns and operates a petroleum distribution terminal located at 3800 Pickett Road in Fairfax, Virginia. The terminal, also known as the Tank Farm, consists of office and warehouse facilities, a truck loading rack, nine aboveground storage tanks with a total storage capacity of over 17 million gallons, and eleven underground storage tanks with a total capacity of 40,000 gallons. The Tank Farm is located above a "recharge" area of an aquifer, which is a major underground water source for nearby creeks and streams. It is also near residential properties owned by the homeowners in this case and by others.
 
 
 3
 Plaintiffs allege that over the course of many years beginning prior to December of 1988, petroleum products, consisting of diesel fuel, aviation fuel and gasoline, leaked into the soil and groundwater at the Tank Farm and the surrounding land, and an oil plume began moving toward the properties of the homeowners. Some constituent parts of these petroleum products are toxic and, under certain conditions, constitute a health hazard. Sometime in September 1990, visible petroleum products appeared in Crook Branch Creek which flows near and along the homeowners' properties. The Virginia State Water Control Board ("the State Board") investigated the leak. Pursuant to the direction of the State Board, Texaco conducted tests on the tanks and the lines, installed on-site and off-site monitoring wells, and installed an oil recovery trench along a portion of the Tank Farm. Although almost 7,000 gallons of oil were recovered by these means, the State Board concluded that leaking was continuing and that the appropriate control or elimination of such release had not been implemented. In May 1991, the State Board requested that the United States Environmental Protection Agency (the "EPA") assume responsibility for investigating the oil leak and recovering the released products. In response, the EPA created an interagency task force to take further steps.
 
 
 4
 Proceeding under the authority granted by section 311(c) of the Clean Water Act, 33 U.S.C. Sec. 1321(c), section 1431 of the Safe Drinking Water Act, 42 U.S.C. Sec. 300i, and section 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. Sec. 6973, the EPA conducted an investigation, held a hearing, and negotiated an administrative consent order (the "Consent Order") with Texaco, which was entered on September 23, 1991. The EPA found, as a basis for the Consent Order, that if proper measures were not implemented, petroleum would continue to move under the Tank Farm with the natural ground water flow and would migrate to and enter sanitary and storm sewer pipes, eventually entering the basements of residences in the immediate vicinity of the Tank Farm. The EPA also determined that the plume might present an imminent and substantial endangerment to health or the environment within the meaning of section 7003(a) of the RCRA, 42 U.S.C. Sec. 6973(a).
 
 
 5
 The Consent Order required Texaco to place booms on Crook Branch Creek to contain the oily sheen on the surface, and to use sorbent to collect and clean up the oil. The EPA also ordered Texaco to excavate and remove soils contaminated with oil, to operate an emergency measures pumping system, and to monitor weekly wells and storm sewers for the presence of oil. In addition, the EPA put forth an "Emergency Measures Plan," requiring Texaco, inter alia, to develop an appropriate corrective actions plan to eliminate the leaks; to submit this plan to EPA for review and approval; and to implement EPA-approved corrective actions under an EPA-approved schedule. While the order addressed measures to eliminate the causes of the leaking and to neutralize the adverse effects of the oil plume, it recognized that the response action might not address all contamination and that additional long-term measures might be required. The order was scheduled to terminate when its directives were met to the EPA's satisfaction. Since the entry of the order, Texaco has undertaken the corrective steps as required, and there is no evidence in the record that it is not complying with the terms of the order, which still remains in effect.
 
 
 6
 In March 1993, the homeowners filed a complaint against Texaco under the district court's diversity jurisdiction, alleging claims for nuisance and trespass under Virginia common law.* In their complaint, the homeowners alleged that "even under a Consent Order with and under the direction of the Environmental Protection Agency," Texaco has failed to remedy the leaking, and that they "have had, and continue to be threatened with actual petroleum pollution from the Tank Farm in the soils of the creeks on or near their property." The complaint further alleged that the pollution confronts them with a nuisance that "threatens the destruction of their property and danger to their health," and that "direct and actual pollution of the creek beds and the flow of globules of free phase hydrocarbons under their property constitute a trespass" upon their properties. The homeowners requested permanent injunctive relief for greater remedial measures than those included in the Consent Order, and they demanded "such damages, interest and costs to which the Plaintiffs may be justly entitled."
 
 
 7
 On Texaco's motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), the district court dismissed the action on preemption grounds. The court stated:
 
 
 8
 I think the injunctive relief of the type the plaintiffs seek here would conflict with and frustrate probably the purpose of Congress in its EPA remediation efforts under the RCRA. Even though the plaintiffs do not purport to bring their action under that, I think that Act and the action taken here with the remediation effort and order preempts this field, and I think that any injunction I would issue would conflict with that.
 
 
 9
 This appeal followed.
 
 II
 
 10
 We must address preliminarily Texaco's contention that the district court lacked subject matter jurisdiction because the homeowners, in invoking diversity jurisdiction, only alleged the jurisdictional amount in the aggregate, without attributing damages of over $50,000 to each plaintiff as required by law. See 28 U.S.C. Sec. 1332. The complaint in this case alleged that eight properties, with a total value in excess of $2.5 million, were at stake, seven of which are owned by married couples and one by an individual. In their memorandum opposing Texaco's motion to dismiss, the homeowners, relying on Eagle v. American Telephone & Telegraph Co., 769 F.2d 541 (9th Cir.1985), cert. denied, 475 U.S. 1084, 106 S.Ct. 1465, 89 L.Ed.2d 721 (1986), argued that they shared a "common and undivided claim" which could be asserted with one damage amount for purposes of satisfying the diversity statute's jurisdictional amount. Alternatively, the homeowners stated that if the court were to find that their claims are not undivided, "Plaintiffs, by this response, move the Court to allow for an interlineation amendment of [their] Complaint" to demand $312,500 for each couple owning property and $156,250 for the individual property owner. The district court never addressed this motion because it dismissed the complaint on preemption grounds. Since we hold that not all of the homeowners' claims are preempted, we must now address the jurisdictional question.
 
 
 11
 We agree with Texaco that diversity jurisdiction has not been adequately pleaded. It is fundamental that each plaintiff must demonstrate the jurisdictional basis and allege the necessary amount in controversy. See Schlesinger v. Councilman, 420 U.S. 738, 744 n. 9, 95 S.Ct. 1300, 1306, 43 L.Ed.2d 591 (1975). While the claims of the several plaintiffs do arise from a single cause, they are not undivided claims with respect to the several properties. Hence, the complaint as it now reads does not adequately plead jurisdiction.
 
 
 12
 Nevertheless, because the defect is in form only and amendments to complaints are to be freely allowed, see Fed.R.Civ.Proc. 15(a), we remand this case to enable the homeowners to amend their complaint to correct the jurisdictional defect. See National Post Office Mail Handlers v. United States Postal Service, 594 F.2d 988 (4th Cir.1979).
 
 III
 
 13
 We now turn to the principal question presented on appeal, whether the RCRA, or the administrative order entered pursuant to it, preempts state common law causes of action. A review of the applicable preemption principles is useful.
 
 
 14
 The Supremacy Clause of the United States Constitution mandates that "the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, Sec. 2. Thus, federal legislation, if enacted pursuant to Congress' lawful authority, can nullify conflicting state or local actions. See McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819); Worm v. American Cyanamid Co., 970 F.2d 1301, 1304-05 (4th Cir.1992).
 
 
 15
 There are two ways for preemption to occur. First, Congress may expressly provide that federal law supplants state authority in a particular field, or its intent to preempt may be implicit in regulating so pervasively in the field as not to leave any room within which a state may act. See Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); Worm, 970 F.2d at 1304. And second, even absent an express or implied congressional intent to preempt state authority in a field, state law is preempted to the extent that it actually conflicts with federal law. See Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Com., 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983).
 
 
 16
 As the Supreme Court recently instructed, "[c]onsideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.' " Cipollone v. Liggett Group, Inc., --- U.S. ----, ----, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Moreover, in deciphering congressional intent, we are guided by principles of federalism. Where "the regulated conduct touched interests so deeply rooted in local feeling and responsibility, ... in the absence of compelling congressional direction, [the court] could not infer that Congress had deprived the States of the power to act." San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). Particularly with respect to the potential preemption of common law actions, the Supreme Court has instructed,
 
 
 17
 A common-law right, even absent a saving clause, is not to be abrogated "unless it be found that the preexisting right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory."
 
 
 18
 Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 298, 96 S.Ct. 1978, 1984, 48 L.Ed.2d 643 (1976) (quoting Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 437, 27 S.Ct. 350, 354, 51 L.Ed. 553 (1907)). The ultimate touchstone of preemption analysis is the purpose of Congress. See Malone v. White Motor Corp., 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978).
 
 
 19
 When Congress' intent regarding preemption is unclear, state law must nevertheless yield when it conflicts with federal law. In making the determination of whether state law conflicts with federal law, the test to apply is whether "it is impossible to comply with both state and federal law" or whether "the state law stands as an obstacle to the accomplishment of the full purposes and objectives" of federal law. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984); see also Worm, 970 F.2d at 1305.
 
 
 20
 With such principles at hand, we now turn to the facts to see whether the RCRA, or the administrative consent order entered in this case under section 7003 of the RCRA, preempts state law trespass or nuisance actions.
 
 
 21
 * The RCRA contains no provision which mandates comprehensive preemption of all state laws in the field of hazardous waste removal being regulated by the Act. The task, therefore, is to determine whether the regulatory scheme is so comprehensive in that field as to leave no room within which the states may act, or whether any provisions in the Act actually conflict with the state causes of action.
 
 
 22
 Although the RCRA is national in scope and universal in coverage, we believe that its provisions do not regulate so pervasively as to occupy the field completely. Any doubt on this point is removed by the explicit provisions in the Act which reveal a contrary intent. First, even though the RCRA declares that it is a "national policy of the United States that, wherever feasible, the generation of hazardous waste is to be reduced or eliminated as expeditiously as possible," 42 U.S.C. Sec. 6902(b), a separate provision also states that it is the will of Congress that the RCRA guide "a cooperative effort among the Federal, State, and local governments and private enterprises." 42 U.S.C. Sec. 6902(a)(11) (emphasis added). In addition, provisions in the RCRA allow states to run their own waste management programs, although the Act does require federal approval of such state plans. See 42 U.S.C. Sec. 6943. Thus, the legislation seems to contemplate state law action, rather than preempt it in its entirety.
 
 
 23
 The homeowners argue that the general savings clause found in the RCRA is conclusive of Congress' intent to preserve state common law actions. That clause states:(f) Other Rights Preserved:
 
 
 24
 Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or requirement relating to the management of solid waste or hazardous waste, or to seek any other relief (including relief against the Administrator or a State agency).
 
 
 25
 42 U.S.C. Sec. 6972(f). Although the Supreme Court has acknowledged that a savings clause such as Sec. 6972(f) does "negate[ ] the inference that Congress 'left no room' for state causes of action," International Paper Co. v. Ouellette, 479 U.S. 481, 492, 107 S.Ct. 805, 812, 93 L.Ed.2d 883 (1987), that negation, standing alone, is not determinative of the preemption analysis. In Ouellette, the Supreme Court found that a similar savings clause found in the Clean Water Act did not compel the finding that there was no preemption, stating, "[the savings clause] merely says that '[n]othing in this section,' i.e., the citizen-suit provisions, shall affect an injured party's right to seek relief under state law; it does not purport to preclude pre-emption of state law by other provisions of the Act." 479 U.S. at 493, 107 S.Ct. at 812. The same conclusion is therefore reached under the RCRA, because 42 U.S.C. Sec. 6972(f) also is found in a general citizen-suit provision of the RCRA. The natural reading of the phrase, "nothing in this section shall restrict" does not preclude preemption by other sections of the RCRA. The Supreme Court in Ouellette also cautioned against giving too much meaning to such savings clauses:
 
 
 26
 The fact that the language of [the saving clause] is repeated in haec verba in the citizen-suit provisions of a vast array of environmental legislation ... indicates that it does not reflect any considered judgment about what other remedies were previously available or continue to be available under any particular statute.
 
 
 27
 479 U.S. at 494 n. 14, 107 S.Ct. at 813 (citation omitted). Notwithstanding these admonitions, when we consider the entire legislative scheme of the RCRA together with the language of 42 U.S.C. Sec. 6972(f), we are led to conclude that the RCRA does not preempt by implication the field staked out by the Act's regulation. Nevertheless, it remains to be determined whether state common law actions are preempted by an actual conflict with some provision of the Act.
 
 B
 
 28
 Texaco contends that the relief requested by the homeowners in their common law claims would conflict with the EPA's authority under section 7003 of the RCRA to act on "imminent hazards," or with the Consent Order entered pursuant to section 7003. Texaco maintains that it was the intent of Congress that once the EPA acts under the imminent hazard provision, it has the exclusive authority to remedy the hazard.
 
 
 29
 Section 7003 of the RCRA, as amended in 1984, states:
 
 Imminent Hazard:
 
 30
 (a) Authority of Administrator
 
 
 31
 Notwithstanding any other provision of this chapter, upon receipt of evidence that the past or present handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment, the Administrator may bring suit on behalf of the United States in the appropriate district court against any person ... who has contributed or who is contributing to such handling, storage, treatment, transportation or disposal to restrain such person.... The Administrator may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and the environment.
 
 
 32
 42 U.S.C. Sec. 6973(a).
 
 
 33
 We find nothing in section 7003 that gives the EPA exclusive authority to act, nor do we find anything to suggest such a conclusion in the legislative history. There can be little doubt that Congress intended for the EPA to have broad powers to remedy imminent hazard situations under section 7003. This intent is revealed in a contemporaneous House committee report:Section 7003 is designed to provide the Administrator with overriding authority to respond to situations involving a substantial endangerment to health or the environment, regardless of other remedies available through the provisions of the Act.
 
 
 34
 Subcomm. on Oversight and Investigations of the Comm. on Interstate and Foreign Commerce, Report on Hazardous Waste Disposal, H.R. Comm. Print No. 96-IFC 31, 96th Cong., 1st Sess. 32 (1979) ("Eckhardt Report"). Moreover, we have previously recognized that "the authority [of the Administrator] to abate waste hazards is expansive." United States v. Waste Industries, Inc., 734 F.2d 159, 166 (4th Cir.1984).
 
 
 35
 However, the Eckhardt Report also indicates that Congress did not intend Sec. 7003, which authorizes EPA action, to be the sole remedy against violators of the RCRA: "[U]se of the imminent hazard provisions of this Act does not preclude further enforcement actions against the violators." Eckhardt Report, at 32. A Senate committee report during the period preceding the Act's amendment reveals a similar intent. The Senate Committee on Environment and Public Works expressed concern that private citizens would not be given adequate remedies under the RCRA. In a report preceding the amendment of the RCRA to include a new citizen-suit provision, the Committee cautioned:
 
 
 36
 Even with the new requirements for public participation in settlements, participation short of intervention does not provide citizens with the same opportunities to protect their interests or to seek a judicial order for complete abatement. A decision to bar such an opportunity should not be taken lightly.
 
 
 37
 Report of the Committee on Environment and Public Works, S.Rep. No. 98-284, 98th Cong., 1st Sess. 56 (1983). The report also makes clear that "Section 7003 is an alternative and supplement to other remedies." Id. at 59.
 
 
 38
 We have found nothing in the legislative history to show that Congress intended for the EPA's action under section 7003 to be the exclusive remedy, denying all remedies to private individuals. On the contrary, the legislative history recited indicates that while Congress intended for the EPA to have broad authority to act in an imminent hazard situation, it also intended such action to complement other efforts and remedies. Finding nothing in the language of the Act or in its legislative history which confers on the EPA the exclusive authority to act in such situations, we conclude that section 7003, which authorizes the EPA to act, does not, in the absence of some EPA action, conflict with the state law causes of action asserted by the homeowners.
 
 
 39
 Our conclusion does not end our preemption analysis, however. We must still examine whether the Consent Order, entered pursuant to the EPA's authority under Sec. 7003, preempts the homeowners' state law claims on the ground that any state law remedy would conflict with the Consent Order.
 
 C
 
 40
 Texaco argues that homeowners are, through their state law actions for nuisance and trespass, seeking injunctive relief that would conflict with the existing Consent Order between Texaco and the EPA. Texaco argues further that complying with any court order based on state law would force Texaco to violate the Consent Order's requirement that any corrective action be submitted to and approved by the EPA. Thus, Texaco maintains that any such state law remedies are preempted by the Consent Order.
 
 
 41
 Article VI of the Constitution provides for the supremacy of federal laws over "anything" in the constitution or laws of the states that conflict. Although the issue is not explicitly raised by the homeowners in this case, we must first establish that the EPA's Consent Order may derive rights of supremacy from the clause that elevates federal laws.
 
 
 42
 The Supreme Court has held that federal regulations issued by agencies have "no less pre-emptive effect than federal statutes". Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984) (quoting Fidelity Federal Savings & Loan Assn. v. De la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982)). Indeed, even if an agency, rather than Congress, resolves to preempt an area, its determination will be enforced to preempt conflicting state regulations so long as the determination represents "a reasonable accommodation of conflicting policies that are within the agency's domain." Capital Cities, 467 U.S. at 700, 104 S.Ct. at 2701. The court's role in that case is to determine only whether the agency exceeded its statutory authority or acted arbitrarily. See Fidelity Federal, 458 U.S. at 153, 102 S.Ct. at 3022.
 
 
 43
 Accordingly, we hold that when the EPA, acting within valid statutory authority of the RCRA and not arbitrarily, enters into a consent order, that order will also preempt conflicting state regulation, including a federal court order based on state common law. See United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1454-57 (6th Cir.1991) (holding that consent decree entered into between the EPA and defendants to engage in remedial cleanup of hazardous waste pursuant to CERCLA preempted further state law actions seeking injunctive and declaratory relief that would conflict with the consent decree); cf. Colorado v. Idarado Mining Co., 916 F.2d 1486 (10th Cir.1990) (holding that states may not obtain an order under CERCLA apart from the terms of a valid administrative consent order obtained by the EPA under CERCLA), cert. denied, 499 U.S. 960, 111 S.Ct. 1584, 113 L.Ed.2d 648 (1991).
 
 
 44
 We have previously held that the test for determining whether state law conflicts with federal law is whether "it is impossible to comply with both state and federal law" or whether "the state law stands as an obstacle to the accomplishment of the full purposes and objectives" of federal law. Worm, 970 F.2d at 1305 (quoting Silkwood, 464 U.S. at 248, 104 S.Ct. at 621). The same test applies in determining whether a state-ordered injunction would conflict with the EPA's Consent Order.
 
 
 45
 The Consent Order entered on September 23, 1991, required Texaco to implement certain immediate remedial measures, to submit to the EPA emergency measures plans for EPA review and selection, and once a plan is selected, to implement the plan under an EPA-approved schedule. While the immediate requirements have been satisfied, the record does not reveal the status of the plan because the complaint in this case was dismissed at an early stage. There is, however, no evidence that the EPA is, to date, in any way dissatisfied with Texaco's progress.
 
 
 46
 In these circumstances, the injunctive relief requested by the homeowners from the court would conflict with the remedial measures selected and supervised by the EPA. The homeowners, in their complaint, have asked the district court to order excavation, treatment and replacement of contaminated soil to a specified depth and over a specified area; they have requested that the court direct "enhanced ground water extraction and bio-remediation to reduce the off-site contamination"; and they have requested the construction of a "free phase hydrocarbon trench removal system across the water table." The EPA order addresses the same site and conditions covered by the homeowners' suit and provides its mandatory response, as authorized by Sec. 7003 of the RCRA. Not only would the court, if it granted the relief, be substituting its judgment for the authorized judgment of the EPA, the court also would be usurping the review role given by statute to the EPA. See 42 U.S.C. Sec. 6973.
 
 
 47
 Accordingly, we hold that the homeowners' claims with respect to the contamination described in the complaint, to the extent they seek injunctive relief before the EPA's Consent Order is fulfilled and terminated, are preempted by the EPA's Consent Order.
 
 IV
 
 48
 Texaco contends that if the claims for injunctive relief are preempted, the homeowners' entire complaint should be dismissed, arguing that the complaint effectively makes no claim for damages or, alternatively, that the homeowners have abandoned any demand for damages.
 
 
 49
 We cannot agree that the complaint is limited to a request for injunctive relief. While it is true that the main thrust of the complaint addresses threatened damage, as expected from a spreading oil plume, the complaint cannot be so confined. Paragraph 36 of the complaint reads, "[t]he Plaintiffs have had ... actual petroleum pollution from the Tank Farm in the soils of the creeks on or near their property." And paragraph 38 reads, "[t]he direct and actual pollution ... under their property constitute a trespass by the Defendants upon the land of the Plaintiffs." Finally, the ad damnum clause demands "such damages, interest and costs to which the Plaintiffs may be justly entitled."
 
 
 50
 The record, moreover, reveals no evidence that the homeowners waived their claim for damages. The principal aim of the homeowners' arguments, made in response to Texaco's motion to dismiss, was directed at the question of whether they could obtain injunctive relief from the court. But it also appears that they continued to maintain a claim for damages and that they actually refuted a suggestion that they were not claiming damages. In their memorandum opposing Texaco's motion to dismiss, the homeowners stated, "These globules are flowing under Plaintiffs' property." An affidavit attached to the memorandum confirmed the existence of actual damage, stating: "Additional contamination occurred since then and this contamination continues to this date." The affidavit further claimed that such contamination is causing a "discernable stench of oil" behind the homes. While this position is confused by other statements in homeowners' memorandum such as, "[i]n the instant case, the action is for the common injunctive relief of all of the Plaintiffs," a dialogue at the hearing before the district court reveals that the homeowners did not abandon their damages claims. In arguing to the court, counsel for the homeowners said, "I don't find any case, Your Honor, that says that we have lost all of our civil rights, either for damages or for injunctive relief" (emphasis added). He continued to argue that his clients do not want to be told to come back later "when it's all over and get paid money " (emphasis added). We cannot construe this evidence in the record to amount to a waiver of the complaint's demand for damages.
 
 
 51
 Texaco conceded at oral argument that if the complaint were construed as one for damages as well as for injunctive relief, they would agree that the RCRA does not preempt the damages claims. We think the law confirms its position.
 
 
 52
 The Supreme Court has held repeatedly that state law damages claims are not necessarily preempted by federal statutes that regulate the same field. For instance, in Cipollone, the Supreme Court held that a federal warning label requirement on cigarette packages does not preempt state common law damage actions. In Silkwood, the Supreme Court also held that federal statute regulating nuclear safety did not preempt state law tort suits seeking damages. Similarly, we held in Worm v. American Cyanamid Co. that the Federal Insecticide, Fungicide and Rodenticide Act did not preempt state tort actions seeking damages for breach of federally-imposed standards.
 
 
 53
 Moreover, state law damages claims would not conflict with the Consent Order, which makes no provision for the payment of damages to the homeowners. Indeed, section 7003, the provision under which the order was entered, gives the EPA authority to seek injunctive relief but no authority to seek damages on behalf of private parties. See H.R.Rep. No. 98-198, Part III, 98th Cong., 1st Sess. 21 (1983) ("In RCRA, the EPA has the authority to seek an injunction where a particular pollutant or the level of pollution under a permit is later found to pose a substantial threat to public health in that situation. Section 7003, 42 U.S.C. Sec. 6973."). Since section 7003 does not address compensation for damages caused by the imminent hazard, we believe Texaco was correct in concluding that state damages claims do not conflict with its provisions. See Worm, 970 F.2d at 1305 (quoting Jones v. Rath Packing Co., 430 U.S. 519 at 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (where traditional state law remedies are involved, "[the court] should be fairly assured of the congressional intent, because [the court] must assume that the balance between federal and state law will not be disturbed 'unintentionally by Congress or unnecessarily by the courts.' ")); Silkwood, 464 U.S. at 251, 104 S.Ct. at 623 ("[i]t is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct."). As the Supreme Court observed in Cipollone:
 
 
 54
 [T]here is no general, inherent conflict between federal preemption of state warning requirements and the continued vitality of state common law damages actions.
 
 
 55
 --- U.S. at ----, 112 S.Ct. at 2618. Accordingly, we hold that the homeowners' damages claims under state law are not preempted by section 7003 of the RCRA.
 
 V
 
 56
 Texaco would have us address also whether the homeowners adequately pleaded state common law actions for nuisance and trespass in their complaint. However, since the district court did not address this question in the first instance, because it found the claims to be preempted, we believe that those issues are best considered on remand in the context of the homeowners' efforts to pursue their state common law claims.
 
 
 57
 Accordingly, we affirm the district court's ruling insofar as it concluded that the claim for injunctive relief was preempted, but we vacate the order of dismissal to permit the homeowners to amend the complaint to satisfy jurisdictional requirements and to pursue their common law damages claims based on nuisance and trespass.
 
 
 58
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 MURNAGHAN, Circuit Judge, concurring:
 
 59
 I join the Court's opinion and write separately only to emphasize my understanding that our preemption analysis of plaintiffs' claim for monetary damages is consistent with our preemption analysis of their claim for injunctive relief, as required by a long line of Supreme Court decisions.
 
 
 60
 As to injunctive relief, we hold that the plaintiffs' claim is preempted only to the extent that it may actually conflict with the EPA's Consent Order and only while that Order remains in effect. The Order, which the EPA entered pursuant to a federal statute, requires Texaco to take certain clean-up measures. Invoking Virginia's common law of nuisance and trespass, the plaintiffs seek a court order requiring Texaco to take different or additional clean-up measures. Because it apparently would be impossible for Texaco to comply with both orders, we hold that, so long as the (federal-law) Consent Order remains in effect, it preempts the (state-law) injunctive order that plaintiffs have requested.
 
 
 61
 A long line of Supreme Court decisions requires us to apply the same preemption analysis to plaintiffs' claim for damages. In International Paper Co. v. Ouellette, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987), the Court expressly refused to hold that a federal environmental statute preempted some state-law remedies but not others. See id. at 498 n. 19, 107 S.Ct. at 814 n. 19 (recognizing that the availability of compensatory relief may have the same effect on a polluter as direct regulation, and explaining that a state-law compensatory damages action for nuisance was preempted because (1) a state-law injunctive suit for nuisance was preempted and (2) there was no evidence that Congress intended to "split" the remedies for preemption purposes when it enacted the environmental statute) (citing Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984)).*
 
 
 62
 In the present case, I join the Court's opinion on the understanding that we would not allow the plaintiffs to gain indirectly, through the threat of monetary damages, what we have expressly prevented them from gaining directly through an injunction--mandatory clean-up measures that are incompatible with those already approved by the EPA. As with injunctive relief, the plaintiffs' claim for damages is preempted only to the extent that those damages arise from conduct regulated by the EPA's Consent Order.
 
 
 
 *
 Although the plaintiffs also alleged federal question jurisdiction under section 1017 of the Oil Pollution Liability and Compensation Act, 33 U.S.C. Sec. 2717, their complaint fails to allege any federal cause of action, and we therefore do not consider it
 
 
 *
 As Justice Frankfurter explained nearly thirty-five years ago, "regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 247, 79 S.Ct. 773, 781, 3 L.Ed.2d 775 (1959); accord Cipollone v. Liggett Group, Inc., --- U.S. ----, ----, 112 S.Ct. 2608, 2620, 120 L.Ed.2d 407 (1992) (plurality opinion) (quoting Garmon ). State efforts to redress private wrongs and to grant compensation for past harm cannot be exerted to regulate activities that are also subject to conflicting federal regulation. Thus, common-law damages actions are preempted to the same extent as common-law injunctive suits. See Garmon, 359 U.S. at 247, 79 S.Ct. at 781; cf. Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317-32, 101 S.Ct. 1124, 1130-37, 67 L.Ed.2d 258 (1981) (holding preempted a state common-law claim that would have allowed recovery of damages in tort for abandonment of a rail line when that abandonment had been approved by the Interstate Commerce Commission); Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 231, 84 S.Ct. 784, 789, 11 L.Ed.2d 661 (1964) (holding that a state may not, through a common-law damage claim for unfair competition, enforce a state standard "that clashes with the objectives of the federal patent laws")