Anthony **WILLIAMS**, et al., Plaintiff,

v.

**POTOMAC ELECTRIC POWER COMPANY**, Defendant.

No. Civ. PJM 00–1429.

United States District Court, D. Maryland.

Sept. 8, 2000.

Ralph N. Albright, Jr., Mark A. Srere, Morgan, Lewis & Bockius, LLP, Washington, DC, for Defendant.

## OPINION

MESSITTE, District Judge.

This proposed class action suit was removed from the Circuit Court for Calvert County. Anthony and Toni Williams, the two named Plaintiffs, on behalf of themselves and others similarly situated, have sued the Potomac Electric Power Company (PEPCO) for damages resulting from an oil discharge from a PEPCO pipeline that occurred on April 7, 2000 at or near Swanson Creek, a tributary of the Patuxent River in Southern Maryland. Plaintiffs have filed a Motion to Remand the case to state court which PEPCO opposes. On the supposition that the Court will retain jurisdiction, PEPCO has filed a Motion to Dismiss the Complaint.

The Court will DENY Plaintiffs' Motion to Remand. PEPCO's Motion to Dismiss will be DENIED IN PART and DEFERRED IN PART.

### I.

A) Plaintiffs reside in Prince Frederick, Calvert County, Maryland. PEPCO is a corporation duty organized according to the laws of the Commonwealth of Virginia and the District of Columbia, with principal offices in the District of Columbia. PEPCO controls, maintains and operates a 51–mile long pipeline for the purpose of transporting oil to the Chalk Point Generation Station in Aquasco, Maryland where the oil is converted to electricity. On April 7, 2000, a section of the 51–mile long pipeline burst, causing more than 100,000 gallons of fuel oil to leak into marshland near the Chalk Point Station. The oil eventually entered the Patuxent River and washed ashore on land owned by Plaintiffs as well as others in Calvert and Prince George's Counties.[1] Plaintiffs claim that as a result

Steven B. Preller, Peter D. Fastow, Troese, Fastow & Preller, Annapolis, MD, Dennis C. Reich, Paul T. Warner, Houston, TX, for Plaintiff.

1. Plaintiffs allege only that the oil affected persons in Calvert and Prince George's Counties. The Court notes that in companion litigation claims relative to the oil spill are also being asserted by residents of St. Mary's County.

they and the 500 or so members of the proposed class suffered environmental damage, loss of use and enjoyment of their property; foul odors; decrease of real property value; loss of use and enjoyment of piers and bulkheads; noxious odors, fumes and hazardous material in the water and on the property; loss of recreational use and enjoyment of the resources of the Patuxent River and of the Patuxent River itself; loss of commercial use and enjoyment of the resources and of the Patuxent River itself; medical expenses; mental distress; and loss of income.

Believing that PEPCO's acts and omissions caused the oil spill, Plaintiffs have framed causes of action against it in negligence (Count I), trespass (Count II), strict liability (Count III), and nuisance (Count IV). As to each count, Plaintiffs, on behalf of themselves and the proposed class, seek damages "in an amount exceeding Twenty–Five Thousand and No/100 ($25,000.00) in compensatory damages, punitive damages, court costs, post judgment interest at the legal rate, and any further relief deemed appropriate by this Court."

B) PEPCO bases its removal of the case to this Court on both federal question and diversity of citizenship grounds. As to the former, PEPCO contends that the Oil Pollution Act of 1990(OPA), 33 U.S.C. § 2701 *et seq.*, which imposes liability *inter alia* for discharges of oil into or upon navigable waters and which establishes a comprehensive scheme for the presentation and consideration of claims arising from such discharges prior to the commencement of litigation, pre-empts the state claims Plaintiffs are attempting to assert.

With regard to diversity jurisdiction, PEPCO points out that the citizenship of the parties is indisputably diverse and that, while the Complaint pleads damages "in excess of $25,000.00," were Plaintiffs to prevail on their claim, their damages would exceed the $75,000.00 diversity jurisdictional amount. PEPCO argues that Plaintiffs seek to enforce a "simple, unitary, individual right" on behalf of the class and that, accordingly, the damages of the class, including punitive damages, should be aggregated for purposes of determining whether the amount in controversy exceeds the jurisdictional minimum. Alternatively, PEPCO asks the Court to exercise supplemental jurisdiction over any unnamed plaintiffs whose damages claims might not satisfy the jurisdictional minimum.

In support of their Motion to Remand, Plaintiffs argue that the present action is not founded on a claim or right arising out of the laws of the United States under 28 U.S.C. § 1331. They contend that OPA does not preempt state causes of action so that their failure to make presentment according to the provisions of OPA is irrelevant. They further deny that PEPCO has shown that the damages they claim exceed the requisite diversity jurisdictional amount.

In reply, PEPCO elaborates upon its OPA pre-emption argument and says that Plaintiffs may not, under the "artful pleading" doctrine, defeat removal by omitting to plead this federal question. Alternatively, PEPCO develops a series of legal and factual arguments to the end of establishing the Court's diversity jurisdiction.[2]

Because issues pertaining to the Motion to Remand and the Motion to Dismiss overlap to a considerable extent, the Court analyzes the issues generically, then applies its conclusions to the respective motions.

---

**2.** Pursuing this line of argument in its Motion to Dismiss, PEPCO asks for dismissal of the case on the grounds that Plaintiffs have failed to present their claims prior to filing suit, as required by OPA, 33 U.S.C. § 2713(a). PEPCO also argues that Plaintiffs have failed to state a claim for nuisance under state law and that they lack any legal basis for claiming either punitive damages or damages for pain and suffering. The Court will DEFER ruling with regard to whether Plaintiffs' state law causes of action or claimed damages are legally cognizable. The focus of the present Opinion will be exclusively upon whether the Court has jurisdiction to hear the case.

## II.

### Does OPA preempt State law causes of action?

A) Whether a case "arises under" federal law for jurisdictional purposes is determined by reference to the "well-pleaded complaint" rule. *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9–10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). By this rule the Court considers what appears in the plaintiff's statement of claim without reference to the answer filed by defendant. There is no federal question jurisdiction where a defendant simply claims that a complaint based on state law is preempted by federal law. *Gully v. First Nat'l Bank*, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936). Thus a defendant cannot ordinarily exercise "defensive preemption," that is, remove a case from state court on the ground that state law is preempted by federal law. *Franchise Tax Board*, 463 U.S. at 13–14, 103 S.Ct. 2841. On the other hand, because the preemptive force of certain federal statutes is sufficiently strong that it displaces any state causes of action, in such cases a plaintiff's "artful pleading" of state law will not undermine the federal nature of the lawsuit and the state court action will be removable to federal court. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 66–67, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987).

Plaintiffs in this case have clearly pleaded what on their face are purely state law causes of action. The question is whether OPA, as PEPCO claims, is sufficiently preemptive to displace those causes of action and validate the removal.

B) For all of PEPCO's arguments that OPA preempts state common law causes of action to recover removable costs and damages in oil spill cases because the state actions would conflict with OPA's "full purposes and objectives," see *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), the matter was effectively put to rest in *U.S. v. Locke*, 529 U.S. 89, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000), decided by the Supreme Court last term. *Locke* involved state regulations governing tanker operations and their interrelation with federal statutes and international instruments applicable to such operations. Finding preemption as to a number of the state regulations, the Court had occasion to comment upon the savings clauses of Title I of OPA:

Title I of OPA contains two saving clauses, stating:

"(a) Preservation of State authorities

. . .

"Nothing in this Act or the Act of March 3, 1851 shall—

"(1) affect, or be construed or interpreted as pre-empting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—

"(A) the discharge of oil or other pollution by oil within such State

. . . . .

"(c) Additional requirements and liabilities; penalties

"Nothing in this Act, the Act of March 3, 1851 (46 U.S.C. § 183 et seq.), or section 9509 of [the Internal Revenue Code of 1986 (26 U.S.C. § 9509] ), shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof—

"(1) to impose additional liability or additional requirements

. . . . .

"relating to the discharge, or substantial threat of a discharge, of oil." 33 U.S.C. § 2718.

\* \* \*

The savings clauses are found in Title I of OPA, captioned Oil Pollution Liability and Compensation and creating a liability scheme for oil pollution. . . . *Placement of the saving clauses in Title I of OPA suggests that Congress intended to preserve state laws of a scope similar to the matters contained in Title I of OPA,* not all state laws similar to the matters covered by the whole of OPA or to the

whole subject of maritime oil transport. *The evident purpose of the saving clauses is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills. See Gutierrez v. Ada,* 528 U.S. 250 ——, 120 S.Ct. 740, 744, 145 L.Ed.2d 747 (2000) (words of a statute should be interpreted consistent with their neighbors to avoid giving unintended breadth to an Act of Congress).

Our conclusion is fortified by Congress' decision to limit the saving clauses by the same key words it used in declaring the scope of Title I of OPA. Title I of OPA permits recovery of damages involving vessels "from which oil is discharged or substantial threat of a discharge, or which pos[e] the substantial threat of a discharge of oil." 33 U.S.C. § 2702(a). The saving clauses, in parallel manner, permit States to impose liability or requirements "relating to the discharge, of oil." § 2718(c). In its titles following Title I, OPA addresses matters including licensing and certificates of registry, 104 Stat. 509; duties of senior licensed officers to relieve the master, *id.,* at 511; manning standards for foreign vessels, *id.,* at 513; reporting of marine casualties, *ibid.;* minimum standards for plating thickness, *id.,* at 515; tank vessel manning requirements, *id.,* at 517; and tank vessel construction standards, *id.,* at 517–518, among other extensive regulations. If Congress had intended to disrupt national uniformity in all of these matters, it would not have done so by placement of the saving clauses in Title I.

\* \* \*

Limiting the saving clauses as we have determined respects the established federal-state balance in matters of maritime commerce between the subjects as to which the States retain concurrent pow-

ers and those over which the federal authority displaces state control. We have upheld state laws imposing liability for pollution caused by oil spills. *See Askew v. American Waterways Operators, Inc.,* 411 U.S. at 325, 93 S.Ct. 1590, 36 L.Ed.2d 280. Our view of OPA's savings clauses preserves this important role for the States, which is unchallenged here. (Emphasis supplied)

120 S.Ct. At 1145–47.

■ The Supreme Court has thus effectively foreclosed any argument as to preemption in this case. OPA does not preempt "state laws of a scope similar to the matters contained in Title I of OPA," such as the state common law actions pleaded here. There is no basis for removal jurisdiction predicated on OPA.[3] The Court turns to the diversity question.

### III.

### *Do Plaintiffs Satisfy the Amount–in–Controversy Minimum?*

In view of the fact that the citizenship of proposed class Plaintiffs and PEPCO is concededly diverse, the focus of the Court is upon the amount-in-controversy prong of diversity jurisdiction.

■ A) Ordinarily the sum claimed by the plaintiff in his complaint determines the jurisdictional amount if made in good faith. *See St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938). However, where a plaintiff's complaint in state court fails to specify a particular amount of damages, the removing defendant may establish by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional amount. *Sanchez v. Monumental Life Ins. Co.,* 102 F.3d 398, 404 (9th Cir.1996); Wright, Miller & Cooper, Federal Practice and Procedure 3rd, § 3702, n. 5. The removing defendant need not prove specific facts if it is plain from the face of

---

**3.** And there is, in consequence, no requirement for the presentment of claims under OPA prior to commencing suit.

the complaint that the claim exceeds the jurisdictional minimum. *See Shanaghan v. Cahill,* 58 F.3d 106, 112 (4th Cir.1995). The court, however, looks at the record as a whole as of the time the issue was raised, including affidavits. *Id.; see also Adkins v. Gibson,* 906 F.Supp. 345, 347 (S.D.W.Va. 1995). Once the removing defendant has made the required *prima facie* showing, the plaintiff must prove "to a legal certainty" that his claims are for less than the jurisdictional minimum. *St. Paul Mercury Indemnity Co.,* 303 U.S. at 289, 58 S.Ct. 586.

■ B) Plaintiffs for themselves and others of their proposed class claim damages "in excess of $25,000," a seemingly modest sum in view of the catalog of harms to their property and riparian rights that they say PEPCO caused. But apart from that, the Court is satisfied that PEPCO has made a *prima facie* showing, at least as far as the two Plaintiffs are concerned that their claim for damages exceeds $75,000. The Court is persuaded that *Feikema v. Texaco Inc.,* 16 F.3d 1408 (4th Cir.1994), cited by PEPCO, is apposite. *Feikema* involved a suit in which several homeowners sued Texaco, alleging that an oil leak from a petroleum distribution tunnel owned by Texaco damaged their properties. There, as here, the complaint sought damages in an unspecified amount. Although in that case it was plaintiffs who were attempting to establish the jurisdictional amount, the court held that one way in which they might do so would be to assert the value of their individual properties. The court thus allowed the homeowners to amend their complaint to correct the jurisdictional defect. 16 F.3d at 1412.

In the case at hand, an uncontested affidavit based on a search of the land records of Calvert County shows that for the most recent period available Plaintiffs' property at 400 Riverside Drive, Prince Frederick, was valued for real estate pur-

poses at a total of $1,105,950.00, of which $166,400 was the assessed value of the land and $939,550 the value of the improvements. Beyond that, PEPCO's counsel wrote to counsel for Plaintiffs asking that Plaintiffs stipulate that their compensatory damages do not exceed $75,000, to which Plaintiffs' counsel replied that his clients were "unable and unwilling" to do so.[4] PEPCO has thus met its preponderance burden that Plaintiffs' claim for damages exceeds $75,000.00. Plaintiffs have not demonstrated to "a legal certainty" that their recovery will be less than that.

C) Given that the two Plaintiffs satisfy the jurisdictional minimum, what about the 500 or so members of the proposed class?

■■ Faced with *Zahn v. International Paper Co.,* 414 U.S. 291, 300–01, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), which held that separate and distinct claims by class members cannot be aggregated for jurisdictional purposes, PEPCO argues that aggregation is appropriate in the present case because certain claims of the proposed class are not separate and distinct but are held in common and based on a "single, unitary, undivided right." *See Troy Bank v. G.A. Whitehead & Co., Inc.,* 222 U.S. 39, 40–41, 32 S.Ct. 9, 56 L.Ed. 81 (1911). Specifically, says PEPCO, Plaintiffs invoke two rights in which all members of the class would have a common and undivided interest—first, the claim for damages to shorelines and, second, the right to enjoy and use the Patuxent River. PEPCO offers the affidavit of its officer responsible for responding to the oil discharge, who affirms that it has cost or will cost PEPCO, on average, $800,000 per mile to remove oil from shorelines affected by the April 7, 2000 event and in excess of $10 million dollars to remove oil from the Patuxent River. PEPCO also cites Maryland case law to the effect that the land between the high water mark of the shoreline and the body of navigable water is

4. Courts have considered the presence or absence of such a stipulation in determining whether a removed case should remain in federal court or go back to state court. *See* Wright, Miller and Cooper, § 3702, n. 26.

owned by the State for the benefit of the public generally and that the public therefore has a common and undivided interest in the land. *See e.g., Anne Arundel County v. City of Annapolis,* 352 Md. 117, 132–33, 721 A.2d 217, 224–25 (1998). With regard to navigable waters such as the Patuxent, PEPCO points out that the public has an easement to use these waters for boating, fishing and the like so that the proposed class of plaintiffs has a common and undivided right to the use and benefit of the Patuxent. *See e.g., Delmarva Power & Light Co. of Md. v. Eberhard,* 247 Md. 273, 276–77, 230 A.2d 644, 646 (1967).

 All this overlooks the fact, however, that under Maryland law any claim that an individual proprietor of land bordering on navigable waters may have regarding his use and enjoyment of the waters and to have them remain free of unreasonable pollution is an individual right. *See Jacob Tome Institute v. Davis,* 87 Md. 591, 41 A. 166 (1898). Moreover, it seems virtually certain that the riparian owners, to recover such for damages caused by the pollution, would have to allege special injury different from that of the public generally. *See* 78 AmJur.2d, Waters, §§ 109, 279. The mere fact that several riparian owners may have sustained damages of a similar nature would not *ipso facto* convert the case into one involving a "common undivided interest" for purposes of amount in controversy jurisdiction. Indeed, the Fourth Circuit in *Feikema* specifically rejected the claim of the homeowners that they shared a common and undivided claim for purposes of satisfying the diversity statute's jurisdictional amount. *Feikema,* 16 F.3d at 1412.

 PEPCO's argument that punitive damages should be aggregated to satisfy the amount in controversy requirement is no more persuasive. The suggestion is that a punitive damage award would arise from the common interest in the environment and from social welfare concerns.

While there is some authority to this effect, *see Allen v. R & H Oil and Gas Co.,* 63 F.3d 1326, 1333–34 (5th Cir.1995), there is also contrary authority which characterizes punitive damages claims as "separate and distinct," making aggregation impermissible. *See Ard v. Transcontinental Gas Pipe Line Corp.,* 138 F.3d 596, 601 (5th Cir.1998); *Green v. H & R Block, Inc.,* 981 F.Supp. 951, 953–55 (D.Md.1997). Without delving into that debate, however, some practical considerations remain. Even if the claim for punitive damages were viewed as common and undivided, there would still be no basis other than sheer speculation for determining what that amount might be.[5] Indeed, as PEPCO itself has argued in companion cases to the present litigation, there is considerable doubt whether punitive damages are even recoverable with regard to most if not all of the state law claims in the case. The Court declines to aggregate punitive damages for jurisdictional purposes.

D) That leaves the final proposition submitted by PEPCO, namely that even if the amount in controversy with respect to the unnamed plaintiffs is unclear, the Court can exercise supplemental jurisdiction over those plaintiffs. The argument requires the Court to find that the supplemental jurisdiction statute, codified at 28 U.S.C. § 1367, overruled the *Zahn* decision at least insofar as *Zahn* prohibited a federal court from exercising ancillary jurisdiction over the state law claims of individual class members who do not meet the amount in controversy requirement.

In this, the Court is not obliged to write on an entirely clean state. While the Supreme Court and the Fourth Circuit have yet to decide the matter, the Fifth and Seventh Circuits have. In *In re Abbott Laboratories,* 51 F.3d 524 (5th Cir.1995), the Fifth Circuit concluded that Section 1367 effectively did overrule *Zahn. See also In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599 (7th

---

**5.** The Fifth Circuit panel in *Ard,* which found that the jurisdictional amount to be satisfied

based on the nature of the damages prayed, seems to have stretched the point too far.

Cir.1997). *But see Leonhardt v. Western Sugar Co.*, 160 F.3d 631 (10th Cir.1998) (contra). Lower courts have split on the question. *See* Wright, Miller & Cooper, § 3704, p. 168–69; *Chiartas v. Bavarian Motor Works*, 106 F.Supp.2d 872 (S.D.W.Va.2000) (holding *Zahn* abrogated to the extent inconsistent with § 1367).

The problem, as Professors Wright et al. point out, is that "a natural reading of [Section 1367's] language effectively overrules the Supreme Court's Zahn decision and the cases following it. However, the legislative history detailing Congress' objective in enacting · § 1367 indicates that there was no intention of overruling *Zahn.*" Wright, Miller & Cooper at § 3704, p. 168 (footnote omitted). Even so, the Fifth Circuit in *Abbott Laboratories,* while noting that Congress may not have intended to overrule *Zahn,* held that the statute was clear and unambiguous. As the court observed:

> The statute's first section invests federal courts with a power to hear supplemental claims generally, subject to .limited exceptions set forth in the statute's second section. Class actions are not among the enumerated exceptions.

51 F.3d at 528.

The Fifth Circuit chose to follow the statute not only because it was clear but because it did not lead to "an absurd result." *Id.* at 529. Indeed, the Fifth Circuit quotes a commentator to the effect that "[a]brogating *Zahn* would hardly be absurd," since doing so would harmonize case law and "enable federal courts to resolve complex interstate disputes in mass tort situations." *Id. See also Zahn,* 414 U.S. at 302, 94 S.Ct. 505 (Justices Brennan, Douglas and Marshall dissenting).

This Court stands with the Fifth and Seventh Circuits. The Supreme Court has declared on numerous occasions that the legislative intent of Congress is to be derived from the language of the statute itself whenever possible, not from assertions of codifiers directly at odds with the clear language of the statute. *See e.g.,*

*U.S. v. Lanier,* 520 U.S. 259, n. 6, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). The Court follows that directive here.

 Assuming that the other requirements for class status are met, the Court holds that it has supplemental jurisdiction over all other prospective members of Plaintiffs' class whether or not each individual member meets the minimum amount in controversy. Since unnamed members need not be of diverse citizenship, *Supreme Tribe of Ben–Hur v. Cauble,* 255 U.S. 356, 365–66, 41 S.Ct. 338, 65 L.Ed. 673 (1921), the present case may go forward in this Court as a possible class action.

For the foregoing reasons, Plaintiffs' Motion to Remand will be DENIED. PEPCO's Motion to Dismiss will be DENIED IN PART and DEFERRED IN PART. ·