Willis FRALEY, Jr., and Lanette
L. Fraley, Plaintiffs,

v.

Sean R. STODDARD, D.P.M.,
Defendant,

and

Willis Fraley, Jr., and Lanette
L. Fraley, Plaintiffs,

v.

United States of America, Defendant.

Nos. Civ.A.3:970248, Civ.A.3:97–0866.

United States District Court,
S.D. West Virginia,
at Huntington.

April 8, 1999.

James E. Spurlock, Huntington, WV, for Willis Fraley, Jr., Lanette L. Fraley, plaintiff.

Robert L. Brandfass, Kevin A. Nelson, Steven C. Hanley, Crystal S. Stump, Kay, Casto, Chaney, Love & Wise, Charleston, WV, for Sean R. Stoddard, D.P.M., defendant.

Stephen M. Horn, Assistant U.S. Attorney, Charleston, WV, for United States of America, consolidated defendant.

## MEMORANDUM OPINION

STAKER, Senior District Judge.

Defendants have filed a motion *in limine* requesting the court, in its "gatekeeping" role as required by *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to exclude the testimony of plaintiffs' expert witness Jack B. Gorman, D.P.M., a podiatrist, on the issue of causation in these cases [1] and also filed a motion for summary judgment in defendants' favor, to neither of which motions the plaintiffs filed any formal reply. Accordingly, the two issues before the court for decision here are (1) whether the testimony of Dr. Gorman on the issue of causation in each of these cases should be excluded from the evidence, and (2) if this court holds that his testimony on that issue should be excluded, then should summary judgment be entered in favor of the defendants in each of them.

Without recounting the convoluted course of the proceedings in Civil Action No. 3:97–0248 that resulted in the institution of Civil Action 3:97–0866, which has no bearing upon the issue of whether either of those motions should be sustained or overruled by the court, the court will merely here state that the present status of those two actions is as follows:

Civil Action 3:97–0284 is a diversity of citizenship action brought by plaintiffs against Sean R. Stoddard, D.P.M., a podiatrist, as the only defendant named therein, in which recovery is sought for Dr. Stoddard's alleged negligence in performing upon the plaintiff Willis Fraley, Jr., who is hereinafter referred to as the "plaintiff," at Cabell Huntington Hospital, in Huntington, West Virginia on January 27, 1995, surgery intended to correct a hallux valgus bunion deformity located at the first metatarsal, near the big toe, of the plaintiff's left foot, and in subsequently improperly furnishing post-operative treatment to the plaintiff at that Hospital, all of which allegedly proximately caused the plaintiff to sustain what has been diagnosed as reflex sympathetic dystrophy ("RSD"), also sometimes called "regional pain syndrome," an alleged permanent condition which will result in his suffering serious and debilitating pain in his left foot.

At all times at which he was treating and attending the plaintiff at the Cabell Huntington Hospital, Dr. Stoddard was acting as an independent private practitioner and was not acting as an employee of the Veterans Administration for which reason the court's jurisdiction in Civil Action 3:97–0284 is based upon diversity of citizenship.

On the other hand, Civil Action 3:97–0866 is an action by plaintiffs against the United States of America, as the only defendant named therein, seeking recovery for the alleged negligence of Drs. Bert Mason, D.P.M., and Daniel J. Pelsung, D.P.M., both podiatrists, as well as the alleged negligence of Dr. Stoddard, each of whom participated in the treatment of the plaintiff at the Veterans Administration Medical Center, in Huntington, in their capacities as doctors employed there by the Veterans Administration, which negligence plaintiffs claim proximately caused or contributed to the progression or worsening of plaintiff's RSD initially caused by Dr. Stoddard's alleged negligence in operating on the plaintiff and improperly attending to him post-operatively at the Cabell Huntington Hospital on January 27, 1995. Since Drs. Stoddard, Mason and Pelsung were employees of the Veterans Administration when they allegedly negligently and improperly furnished the plaintiff post-operative treatment and care at the Veterans Administration Medical Center, beginning on January 27, 1995, immediately after Dr. Stoddard's operation upon

---

**1.** The defendant United States in Civil Action 3:97–0866 filed the motion *in limine* in which the defendant in Civil Action 3:97–0248 did not nominally join; however, at the hearing of arguments on that motion counsel for the

defendant Stoddard in Civil Action No. 3:97–0248 very actively and forcefully argued that the court sustain it for which reason the court concludes that the defendant Stoddard joined in that motion.

him was completed, the United States of America is the only defendant in Civil Action 3:97–0855, jurisdiction of which is based upon the Federal Tort Claims Act.

Plaintiff Lanette L. Fraley, wife of the plaintiff Willis Fraley, Jr., is joined as a plaintiff in each of the cases because she asserts in each of them a claim for loss of consortium resulting from the defendants' alleged negligence perpetrated in respect to her husband.

### The Motion In Limine

A hearing on the motion in limine was held by the court on March 26, 1999, at which Dr. Gorman testified by telephone and at which counsel for all parties in both cases were present. His testimony on that occasion was in substance as follows:

He attended the Philadelphia College of Pharmacy and Science from which he received a Bachelor of Science Degree in pharmacy. He thereafter received a degree in podiatry from the Pennsylvania College of Podiatric Medicine in 1967, and then spent a year's general medical and surgical residence program in St. Luke's Hospital in Philadelphia. Thereafter he has actively practiced the profession of podiatry and is currently affiliated and has staff privileges at Warminster General Hospital or Tenant Hospital in Warminster, Pa., is in charge of the residence and the podiatry department at the Wills Eye Surgery Center, has full staff privileges at St. Mary's Hospital in New Town, Pa., privileges at St. Luke's Hospital, in Quaker Town, Pa., full privileges in surgery at Abington Memorial Hospital and has staff privileges at some other medical facilities and approximately fifteen nursing homes.

At no time did Dr. Gorman ever treat or examine the plaintiff. His knowledge concerning the medical care and treatment provided to the plaintiff was gleaned by him from reading the plaintiff's medical records which reflected the care and treatment that was provided the plaintiff during the period beginning on January 27, 1995, when Dr. Stoddard operated on plaintiff's foot at Cabell Huntington Hospital, and extending through several subsequent months during which treatment and care was provided the plaintiff by Drs. Stoddard, Mason and Pelsung at the Veterans Administration Medical Center and until the plaintiff was referred from that Medical Center to a pain specialist.

### Dr. Gorman's expert opinion as to negligence and causation in Civil Action 3:97–0248

Dr. Gorman testified that it was his opinion with reasonable podiatric certainty that Dr. Stoddard's surgery and treatment of the plaintiff's left foot at Cabell Huntington Hospital on January 27, 1995, fell below the standard of care lawfully required of a podiatrist, because while the surgery itself performed on the plaintiff's foot by Dr. Stoddard was correctly performed, in order to perform that surgery Dr. Stoddard improperly injected into the big toe of plaintiff's left foot 38 cc's of anesthesia containing Epinephrine, which was about three times more anesthesia than is normally injected to perform such an operation, the effect of which was to constrict the blood vessels or stop or slow circulation in order to allow a doctor to work in a bloodless field, and in addition Dr. Stoddard improperly also used a tourniquet at 250 millimeters of mercury on plaintiff's foot or toe which further inhibited circulation thereto, all of which resulted in serious damage to the tissues and nerves in his big toe and was the cause of the onset of plaintiff's RSD.

He testified that after that surgical operation was completed, plaintiff's left big toe was cyanotic, i.e., it had turned blue with little if any circulation taking place in it, on account of which, instead of sending the plaintiff home shortly after the operation was completed, as was usual after such operations, the plaintiff had to be admitted back into the hospital and was hospitalized for two days, was administered Percoset, a strong pain killer, which "did not work," and then was given IV morphine, 4 milligrams every two hours, when the normal dose was 2 milligrams, to relieve the pain caused by the condition of

his toe, and after that morphine got him through his hospitalization, he was discharged, and from that point ran into more and more problems with his foot.

He testified that the Epinephrine contained in that excessive amount of anesthesia that was administered by Dr. Stoddard caused damage to the tissues and nerves in the plaintiff's left big toe which caused plaintiff's RSD to commence· and caused him to suffer far more pain than that which he would normally have been expected to suffer from an operation such as that performed upon his foot by Dr. Stoddard, and that Dr. Stoddard's failure to recognize that amount of pain and plaintiff's cyanotic toe as symptoms of RSD and Dr. Stoddard's failure to take steps to prevent that RSD from progressing constituted a failure on Dr. Stoddard's part to provide that level of care to the plaintiff which Dr. Stoddard was required to provide.

### Dr. Gorman's expert opinions as to negligence and causation in Civil Action 3:97–0866

Dr. Gorman testified it to be his opinion with reasonable podiatric certainty that each of Drs. Stoddard, Mason and Pelsung failed to provide the plaintiff with the level of care that they and each of them were lawfully required to provide to him as podiatrists at the Veterans Administration Medical Center when he was removed thereto after undergoing the surgery to his left foot performed by Dr. Stoddard at Cabell Huntington Hospital on January 27, 1995, by the failure on the part of them and each of them timely to diagnose that he was suffering from RSD and to treat him therefor in order to prevent the severity thereof from progressing into stage III RSD and becoming irreversible, and instead of timely diagnosing and treating it, they sent him to a pain specialist, and their

delay in treating it caused or permitted it to progress to stage III RSD.

In *Daubert* the Court held that the *Frye* rule had been replaced and superseded by the Federal Rules of Evidence which provide the standard for admitting expert scientific testimony in a federal trial,[2] and prefatorily explained:

> The primary locus of this [the trial judge's "gatekeeping"] obligation is Rule 702[3], which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify.... The subject of an expert's testimony must be "scientific knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science ... [b]ut, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance.... See also *United States v. Downing*, 753 F.2d

---

2. The Federal Rules of Evidence became effective in 1975.

3. Rule 702 provides:
   "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

1224, 1242 (C.A.3 1985) ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute"). The consideration has been aptly described by Judge Becker as one of "fit." *Ibid.*

.        .        .        .        .

Faced with a proffer of expert testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [10], whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue. . . . Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate.

[10]. "Rule 104(a) provides:

Preliminary questions concerning the qualification of a person to be a witness ... or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [pertaining to conditional admissions.] In making its determination it is not bound by the rules of evidence except those with respect to privileges."

509 U.S. at 589–91, 113 S.Ct. 2786 (footnote 3 added) (footnote omitted).

■ The Court then listed those observations to be (1) whether the theory or technique the expert employed is generally accepted in the scientific community; (2) whether it has been subjected to peer review and publication; (3) whether it can and has been tested; and (4) whether the known or potential rate of error is acceptable. *Id.* at 593–94, 113 S.Ct. 2786. The court also pointed out that publication or the lack thereof in a peer reviewed publication is relevant but not dispositive, that "general acceptance" can yet have a bearing on the enquiry and widespread acceptance can be an important factor in ruling

particular evidence admissible, *id.* at 594, 113 S.Ct. 2786, that Rule 403 permits the exclusion of relevant evidence " 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...' ", *id.* at 595, 113 S.Ct. 2786, and that the focus must be solely on principles and methodology, not on the conclusions that they generate. *Id.*

In *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court held that the *Daubert* "gatekeeping" obligation applies not only to "scientific' testimony," but to all expert testimony. 526 U.S. at ——, 119 S.Ct. at 1174, 143 L.Ed.2d at ——.

And in *Cavallo v. Star Enterprise,* 100 F.3d 1150 (4th Cir.1996), the court said:

[T]his court held expressly in *Scott v. Sears, Roebuck & Co.* that federal rules apply to the admission of expert testimony in diversity cases:

Unlike evidentiary rules concerning burdens of proof or presumptions, the admissibility of expert testimony in federal court sitting in the diversity jurisdiction is controlled by federal law. State law, whatever it may be is irrelevant.

789 F.2d 1052, 1054 (4th Cir.1986).

100 F.3d at 1157.

■ Of the numerous medical practitioners who have been consulted as experts by the plaintiffs as well as the defendants, which include neurosurgeons, anestheologists and other physicians, Dr. Gorman is the only one of all of them who will testify to a reasonable degree of medical or podiatric certainty that any alleged negligence of any of Drs. Stoddard, Mason or Pelsung, either caused the plaintiff to sustain RSD, or caused the RSD sustained by him to progress to stage III RSD, regardless of its etiology.

Dr. Gorman testified that he could not "off the top of his head" give a specific peer-reviewed article or any other docu-

mentation or authoritative source that would indicate that 38 cc's of anesthesia containing Epinephrine was too much or that that volume thereof combined with Epinephrine can result in RSD and that he would agree with Doctors Birch and Ozturk that RSD can result from a perfectly performed surgery. He testified that you could just have someone "nip a toe" and you could develop RSD. He testified that he relied solely on his own experience and his training as a pharmacist and podiatrist in concluding and testifying on the issue of causation as set forth above.

As the Court pointed out in *Daubert:*

The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. *Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation.*

509 U.S. at 589–90, 113 S.Ct. 2786 (emphasis added) (footnote omitted).

Indeed, plaintiff presented absolutely no scientific evidence that tended to scientifically validate Dr. Gorman's opinions as to causation here or the reasons upon which his opinions as to causation were based. Plaintiffs presented no scientific literature, peer-reviewed or otherwise, that did so, nor any evidence that Dr. Gorman's theory of causation was generally accepted in the medical or scientific community; nor any evidence that his theory had ever been tested; and since there was no evidence that this theory had ever been tested, there was understandably no evidence as to whether any known or potential rate of error was or was not acceptable. Hence, none of the factors set forth in *Daubert* would favor or permit admission into evidence his opinion on causation. Indeed, there was nothing offered to support the conclusions expressed in Dr. Gorman's opinions as to causation other than his "subjective belief," and as above pointed out, the Court in *Daubert* has held that an opinion of an expert witness based on "subjective belief," without proof of any

"scientific" basis to support that "subjective belief," is not admissible in evidence.

For the foregoing reasons, defendants' motion *in limine* is sustained.

Defendants' Summary Judgment Motion

The defendants' motions for summary judgment are likewise sustained. *See Cavallo v. Star Enterprise*, 100 F.3d 1150, 1159 (4th Cir.1996), in which the trial court had excluded plaintiff's expert witnesses' testimony on the issue of causation alleged in Count I of the complaint and had awarded the defendants' motion for summary judgment as to that Count I, and upon appeal the court said "we defer to the [trial] court's decision to exclude the evidence and affirm its summary judgment on Count I."

Plaintiffs took exception to the court's sustaining of defendants' motion *in limine* and moved that proceedings in these cases be continued to permit plaintiffs time in which to procure other expert testimony on the issue of causation. As stated above, plaintiffs made no response to either of defendants' motion *in limine* or their motion for summary judgment.

On October 7, 1998, an order was entered modifying the initial scheduling order entered on November 24, 1997, in these cases. That October 7, 1998 order provided that all discovery requests and responses were to be completed by March 31, 1999, and provided that "all discovery" ... included the disclosures required by Rule 26(a)(2) [of the Federal Rules of Civil Procedure]. That section deals with "Disclosure of Expert Testimony." For those reasons plaintiffs' motion for a continuance for the reasons stated is not well taken.

Moreover, plaintiffs' pre-trial order lists, other than Drs. Gorman, Stoddard, Mason and Pelsung, some eight medical doctors among witnesses who may testify in person at the trial and about five others who may testify by deposition. It strikes the court that if plaintiffs have not heretofore found an expert witness whose testimony favorable to the plaintiffs on the issue of

**648**

causation would be admissible in these cases, it is highly unlikely that plaintiffs would be able in the foreseeable future to locate an expert witness who would be able to testify favorably to the plaintiffs on that issue.

Defendants have objected to plaintiffs' motion for a continuance on the grounds that further delay in resolving these cases would prejudice their clients and open up discovery which would prejudice them in that they would be required to take further depositions of witnesses when they have gone to substantial expenses deposing the many expert witnesses who as of now may testify in these cases should they go to trial. The court holds theirs is a valid objection.

For the foregoing reasons, plaintiffs' motion for a continuance is overruled.

The clerk of this court is directed forthwith to mail a copy of this Memorandum Opinion to all counsel of record in these actions.